

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00082-CV

———————————————

IN THE INTEREST OF K.W., A CHILD

---

On Appeal from the 97th District Court
Archer County, Texas
Trial Court No. 2022-0073A-CV

---

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

In this private termination suit filed by Appellee Father against Appellant Mother, Mother appeals from the trial court's order terminating her parental rights to their child, K.W.[1] In four points of error, Mother contends that the evidence is insufficient to support the termination of her parental rights under Texas Family Code Subsections 161.001(b)(1)(E), (F), and (P) and that the evidence is insufficient to support the trial court's finding that termination of her parental rights is in K.W.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (F), (P), (b)(2).

Because we conclude that the evidence is sufficient to support the trial court's termination order, we affirm.

## I. Background

Mother began using illegal drugs at the age of 22 when she experimented with marijuana and amphetamine; for 20 years,[2] she struggled with methamphetamine addiction. Although she would go through periods of sobriety, she would eventually "relapse."

K.W. was born in 2014. Mother was sober for 18 months of the first two years of K.W.'s life. Throughout the years both before and after K.W.'s birth, Mother went to rehab several times and had multiple Child Protective Services (CPS) cases opened

---

[1]We use aliases to refer to the parents and initials to refer to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]At the time of trial, Mother was 42 years old.

against her because of her drug use.[3] In 2016, Mother was referred to CPS for the fourth time due to her drug use, and CPS ordered her to go to rehab. Father filed a petition to modify the parent–child relationship[4] and was granted custody in temporary orders. In a 2018 agreed order, the trial court appointed Father custodial parent and ordered Mother to submit to drug tests upon Father's request, up to four times per year. Mother maintained her sobriety and continued to see K.W. per a visitation plan with Father.

Mother began using methamphetamine again in May 2022. Father had heard that Mother "was strung out," and she had stopped regularly seeing K.W. According to Father, when he saw Mother at one of K.W.'s visits, he noticed that she had lost "a lot of weight." He learned that she had lost her job, which she lied to him about. He requested that Mother take a drug test in June 2022.[5] When Mother tested positive for using methamphetamine and amphetamine, Father filed another petition to modify the parent–child relationship requesting that Mother have only supervised visits with K.W. or, alternatively, that Mother's parental rights be terminated. Mother admitted that she had begun using again, and she assured Father that she would stay away from

---

[3]In addition to K.W., Mother has another older child who is not Father's child. Mother's parental rights to that child are not at issue in this case.

[4]Mother and Father had been joint managing conservators of K.W. with Mother named as the custodial parent.

[5]Like Mother, Father had once been addicted to methamphetamine, so he recognized the "signs" of methamphetamine use. Unlike Mother, Father had gotten clean, and at the time of trial, he had been in addiction recovery for 12 years.

K.W. until she could provide a negative drug test result. But Mother continued using; for the next eight to nine months, she was using methamphetamine three to four times per week and occasionally used marijuana.

In September 2022, Mother was arrested for public intoxication; she was then hospitalized for a drug overdose. According to the arresting officer, Mother had been climbing on and trying to get into vehicles parked at her apartment complex. She was "clearly intoxicated" and was hallucinating that "bugs were crawling on her back" while trying to "pick up bugs off the ground that were not there." The officer observed that Mother did not know her whereabouts, that she had a "very altered mental status," and that she was a "danger to herself." At trial, Mother asserted that the officer's allegations were a "mistake in the police report." She later claimed that she had been under the influence of only pills, but a positive drug test result indicated that she had been using methamphetamine and amphetamine. Also around the time of her arrest, Mother had been dating and living with another drug addict. By December 2022 or January 2023, Mother's drug usage had become what she described as "full-blown" addiction. Mother had not seen K.W. since May 30, 2022.

In December 2022, Father amended his petition to modify and requested termination of Mother's parental rights to K.W. Mother, however, did not stop using methamphetamine. In March 2023, she provided another positive drug test result. She later admitted that from the time of her "relapse" in May 2022—and despite not having seen K.W. since then—she continued to use methamphetamine until October

2023 when she "had a complete nervous mental breakdown" and went back to rehab. Mother generally blamed her drug addiction on mental health issues, but she claimed that she would maintain her sobriety "this time" because she was focusing more on her mental health. She also blamed Father, claiming that his refusing to allow her to see K.W.—after she had tested positive for using methamphetamine—made her drug use "worse."

Although Mother asserted that she had never used methamphetamine when K.W. was present, she acknowledged that she had seen him just one week before her positive drug test result in June 2022. When K.W. learned of Mother's issues with addiction, Father had to put him in counseling because his behavior "deteriorated." For example, K.W. would sometimes think that Mother was outside of his window or that she was on the roof of Father's house, and he wanted the family dog to sleep in his room to alert him if someone were at the window. He also expressed that he wanted police officers to sit outside his house at all times and that "the FBI c[ould] make his mom quit doing drugs." When K.W. found out that Mother had been in the same town as him, his behavior "deteriorated again." Father explained that K.W.'s mental health was linked to Mother's addiction and that K.W. had "deal[t] with a lot for a[] . . . nine-year-old kid." Mother acknowledged that she had an addiction problem, and she recognized that K.W. had been suffering the consequences of her actions and that he deserved a sober parent.

A bench trial was held on January 25, 2024. A few weeks before trial, Mother finally provided a negative drug test result. She testified that she had been staying in a "sober living" environment to have more support with her sobriety. According to Mother, her apartment was not a "safe environment for [her] to be in fresh out of recovery" because she would be alone and "without any accountability" while trying to prove that she was a "fit mother."

Based on the evidence before it, the trial court terminated Mother's parental rights. In its termination order, the trial court found that (1) Mother had engaged in conduct or knowingly placed K.W. with persons who engaged in conduct that endangered K.W.'s physical or emotional well-being; (2) Mother had failed to support K.W. according to her ability during a period of one year ending within six months of the date Father filed his petition; (3) Mother had used a controlled substance in a manner that endangered K.W's health and safety and, after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance; and (4) termination of the parent–child relationship between Mother and K.W. is in K.W.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (F), (P)(ii), (b)(2). This appeal followed.

## II. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and

6

(2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due

7

deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that Father proved the specific grounds for termination under Family Code Subsection 161.001(b)(1) and that the termination of the parent–child relationship is in K.W.'s best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### III. Termination Under Subsection 161.001(b)(1)(E)

Mother argues that the evidence is legally—or alternatively, factually—insufficient to support the trial court's finding that she had engaged in conduct that endangered the physical or emotional well-being of K.W. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

## A. Applicable Law

Under Subsection (E), the trial court may terminate a parent's parental rights if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

8

The relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312 (quoting *Boyd*, 727 S.W.2d at 533). The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *See In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* at 739. The relevant conduct may include actions both before the child's birth and while the child is not in the parent's presence. *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *3 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.). Such actions may "create an inference that similar conduct could recur and further jeopardize a child's well-being." *Id.* (quoting *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.)).

Illegal drug use and its effect on the parent's life and her ability to parent may establish an endangering course of conduct. *R.W.*, 129 S.W.3d at 739. Because drug use exposes the child to the possibility that the parent may be impaired or imprisoned,

9

drug use may support termination under Subsection (E). *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *5 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.). Evidence that a parent continued to use illegal drugs even though she knew that her parental rights were in jeopardy demonstrates a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being. *In re A.K.*, No. 02-22-00154-CV, 2022 WL 4545571, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. denied) (mem. op.). The factfinder may give "great weight" to the "significant factor" of drug-related conduct. *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

**B. Analysis**

Mother has used methamphetamine and marijuana for several years, both before and after K.W. was born. Her history shows a pattern of drug use—rehab—sobriety—relapse. Our focus is not on whether Mother had ever made any progress but on whether she continued to use illegal drugs, *see M.M.*, 2021 WL 5227177, at *6, and the evidence shows that she had. Throughout the pendency of this suit, Mother used methamphetamine despite knowing that her parental rights were in jeopardy. She continued to use methamphetamine after she was arrested and hospitalized for her drug use. A few months later, she was in "full-blown" addiction. Further, Mother chose to date and live with someone whom she knew to be a drug addict. It was not until Mother "had a complete nervous mental breakdown" almost a year and a half

10

after her May 2022 "relapse" and well after Father filed this suit, that she decided to recommit to her sobriety.

To Mother's credit, she provided a negative drug test result a few weeks before trial. But a pattern of drug use is "hard to escape," and the trial court, as factfinder, is "not required to ignore a long history of dependency . . . merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Mother may have testified that she intends to stay clean and sober by focusing more on her mental health, but the trial court was not required to believe Mother's assertion that "this time" would be different; rather, it could discredit her self-serving testimony. *See J.O.A.*, 283 S.W.3d at 346; *In re C.L.-F.* No. 02-22-00021-CV, 2022 WL 2353091, at *5 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.). Not even Mother trusted her ability to stay sober if she were to move back into her apartment alone and "without any accountability."

Methamphetamine addiction can wreak havoc not only on the addict but on the addict's family, and young children like K.W. are particularly vulnerable. *See M.M.*, 2021 WL 5227177, at *6. "The danger here is more than 'metaphysical,' and more is at stake than a less-than-ideal family environment." *Id.*; *see In re D.R.*, 631 S.W.3d 826, 834 (Tex. App.—Texarkana 2021, no pet.). Mother's drug use caused behavior that ultimately led to her arrest and hospitalization. Although K.W. was not physically present for said behavior—because Father had kept him away from Mother until she could provide a clean drug test—the record reflects that K.W. was in counseling to

11

address the issues associated with Mother's drug use and absence from his life. Moreover, it is not necessary for K.W. to have suffered actual injury from Mother's behavior, *see J.F.-G.*, 627 S.W.3d at 312, and Mother herself acknowledged that K.W. had been suffering the consequences of her actions. Indeed, the record indicates that the pattern of Mother's methamphetamine addiction subjected K.W. to a life of uncertainty and instability.

Giving due deference to the trial court's findings, without supplanting its judgment with our own, and after viewing the entire record, we hold that the evidence is legally and factually sufficient to show that Mother engaged in a course of conduct that endangered K.W.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *Z.N.*, 602 S.W.3d at 545. Accordingly, we overrule Mother's challenge to the termination of her parental rights under Subsection (E).

Because a finding of only one ground alleged under Family Code Section 161.001(b)(1) is sufficient to support termination, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not reach Mother's points of error regarding termination under Subsections 161.001(b)(1)(F) and (P). *See* Tex. R. App. P. 47.1.

## IV. Best Interest of K.W.

Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in K.W.'s best interest.

## A. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)  the [child's] desires . . . ;

(B)  the [child's] emotional and physical needs[,] . . . now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)  the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

13

(I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).[6] These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis

### 1. K.W.'s Desires

At the time of trial, K.W. was nine years old. He lacked sufficient maturity to express an opinion regarding his parental preference and did not testify at trial. *See A.K.*, 2022 WL 4545571, at *3; *cf.* Tex. Fam. Code Ann. § 153.134(a)(6) (stating a child must be at least twelve years old before his preference, if any, becomes a factor). This factor is therefore neutral.

---

[6]We disagree with Mother's contention that evidence relevant to the *Holley* factors is "not germane to this proceeding []because . . . CPS is not involved." *See In re M.M.*, No. 02-23-00139-CV, 2023 WL 5202870, at *6 (Tex. App.—Fort Worth Aug. 14, 2023, no pet.) (mem. op.) (analyzing *Holley* factors in private termination suit).

### 2. K.W.'s Emotional and Physical Needs Now and in the Future

Father is in a better position to meet K.W.'s emotional and physical needs. Father ensured that K.W. received counseling to address his emotional issues related to Mother's drug addiction and its effect on his life. Father indicated that K.W.'s life had since "gotten ten times better" and that he had been "thriving." Unlike Mother, Father does not face the same possibility of relapsing, getting arrested for an offense associated with methamphetamine use or possession, being hospitalized for a drug overdose, or living with another drug addict.

K.W.'s young age places a premium on parental abilities and the stability of his home to address issues related to Mother's drug addiction. *See In re J.E.*, No. 02-23-00141-CV, 2023 WL 5115202, at *7 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op.). This factor weighs in favor of the trial court's best-interest finding.

### 3. Emotional and Physical Danger to K.W. Now and in the Future

Evidence of Mother's long history of methamphetamine use, including her continued use during the pendency of this suit and despite knowing that her parental rights were in jeopardy, indicates that she will likely continue her pattern of drug use—rehab—sobriety—relapse. This fact alone could constitute a danger to K.W. *See M.M.*, 2021 WL 5227177, at *6. This factor weighs in favor of the trial court's best-interest finding.

**4. Parental Abilities of Mother and Father**

K.W. has now spent most of his life in Father's care. At the time of trial, he lived with Father, Father's wife, and their infant daughter. Father's wife has been an active participant in K.W.'s life since they married in 2021, and Father described her as a "positive woman role model in [K.W.'s] life." The record reflects that Father and his wife have been providing for K.W.'s needs and that K.W. has bonded with Father's wife and his younger half-sister. Father's testimony demonstrated a desire for K.W. to have a safe, drug-free home.

By contrast, Mother's presence in K.W.'s life has been dependent upon her ability to stay sober, with Mother not seeing K.W. at all for nearly two years while she struggled with the aftermath of her most recent relapse. During the pendency of this suit, her actions—her continued methamphetamine use and consequential arrest and hospitalization—indicated that she could not provide for K.W.'s needs. And at the time of trial, Mother doubted her ability to maintain her sobriety outside of a sober living facility. Additionally, the trial court heard evidence that in 2012, CPS took conservatorship of Mother's other child, K.W.'s older half-brother, and though Mother eventually regained custody of him, because of her continued drug use and inability to care for him, Mother's parents have had conservatorship of him since 2022. This factor weighs in favor of the trial court's best-interest finding.

**5. Programs Available to Assist Mother to Promote K.W.'s Best Interest**

Through the years of Mother's struggle with addiction, including both before and after K.W.'s birth, Mother had approximately five CPS cases opened against her and went to rehab eight times. Each time, she voluntarily attended meetings, underwent treatment, took classes, and obtained the necessary certificates to help her overcome her addiction. Yet each time Mother was successfully discharged from these programs, she would inevitably relapse at some point, which happened at least twice after K.W. was born. Based on this evidence, the trial court could have concluded that any additional programs made available to Mother—either voluntary or court-ordered—would not benefit her. This factor weighs in favor of the trial court's best-interest finding.

**6. The Plans for K.W. by Mother and Father**

As for Mother's plans, she testified that she plans to stay sober "this time" by focusing more on her mental health. She also explained that she did not "have any plans" to leave the sober living facility. She offered no plans with respect to K.W. or his future. Father, on the other hand, testified that he and his wife had discussed plans for his wife to adopt K.W. And Father explained that he intended to keep K.W. safe and away from drugs. This factor weighs in favor of the trial court's best-interest finding.

### 7. Stability of Mother's and Father's Homes

K.W. needs a stable, permanent home free of illegal drug use and without the uncertainty of Mother's next relapse. *See id.* at \*8 ("A child's need for permanence through the establishment of a stable, permanent home is a paramount consideration in the best-interest determination."). At the time of trial, Mother was staying in a sober living home with no plans to return to her apartment. Prior to that, she had been transient; after losing her job in 2022 for refusing to take a drug test, Mother could no longer pay rent and lost her apartment, so she would "stay[] from place to place" with friends. Moreover, the record reflects that Mother has struggled with addiction for several years and that she has been given multiple chances to get clean, establish a stable home, and maintain her sobriety; however, she has not.

In contrast, though Father has acknowledged that he once struggled with addiction, he got clean, has maintained his sobriety, and has provided a safe, stable home in which K.W. is thriving. The trial court heard no evidence to the contrary. This factor weighs in favor of the trial court's best-interest finding.

### 8. Mother's Acts or Omissions Indicating that the Parent–Child Relationship is Not Proper and Her Excuses, if Any, for the Acts or Omissions

The record is inundated with evidence of Mother's methamphetamine addiction. She had multiple positive drug test results and provided only one negative drug test result just weeks before trial. Because of Mother's continued drug use, she had missed almost two years of K.W.'s life. Mother's behavior associated with her

18

drug use during that time further underscores the detrimental effect that her addiction has had on K.W. Although she had been making efforts to address her addiction, Mother's May 2022 relapse and the nearly two years that followed indicated that her addiction remained an ongoing concern.

As for Mother's excuses for these acts and omissions, she blamed Father and her mental health issues. Father's actions kept K.W. safe and away from Mother's drug use. Again, the best-interest analysis is child-centered; it does not focus on the parent. *See A.C.*, 560 S.W.3d at 631. While mental health issues may serve as an excuse for certain acts or omissions, *see C.C. v. Tex. Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 220 (Tex. App.—Austin 2022, no pet.), the evidence of Mother's efforts to address her mental health consisted of records of approximately two months of therapy sessions that Mother did not begin attending until two months before trial. She was in therapy from November 2023 (a year and a half since she had last seen K.W.) to January 2024 (days before trial). Although Mother testified that she had been taking medications prescribed by a doctor to help control her mental health issues, she provided no documentation related to this doctor or to any prescriptions. Mother also testified, though, that "most of" her drug use as an addict had been to self-medicate for her ADHD. The trial court was allowed to weigh the sincerity and reasonableness of Mother's efforts to address her mental health issues, and it could have concluded that Mother had not sufficiently addressed her mental health issues. This factor weighs in favor of the trial court's best-interest finding.

19

### 9. Best-Interest Conclusion

Stability and permanence are paramount to a child's upbringing. *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam). Mother cannot provide either. There is no evidence that she can provide K.W. a safe, drug-free home or that she can maintain her sobriety in order to have a meaningful presence in K.W.'s life. A reasonable factfinder therefore could conclude that Mother is unable to provide K.W. with stability and permanence because of her drug addiction and her behavior associated with drug use. In contrast, Father has exhibited a willingness and ability to provide K.W. with stability and permanence.

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have concluded that termination of the parent–child relationship between Mother and K.W. is in K.W.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Giving due deference to the factfinder's findings, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 28–29. Accordingly, we overrule Mother's challenge to the trial court's best-interest finding.

## V. Conclusion

We affirm the trial court's order terminating Mother's parental rights to K.W.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: July 18, 2024